UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

TOBIAS NICKELS,

             Petitioner,

      -vs-

JAMES CONWAY,

            Respondent.

**DECISION AND ORDER
No. 1:10-cv-0413(MAT)**

───────────────────────────────

## I.   Introduction

Represented by counsel, Tobias Nickels ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is serving a sentence of 24-years-to-life at Auburn Correctional Facility as the result of a judgment of conviction entered against him on June 13, 2005, in Steuben County Court of New York State. Following a bench trial, County Court Judge Peter Bradstreet found Petitioner guilty of one count of depraved indifference murder of a person less than 11 years-old (New York Penal Law ("P.L.") § 125.25(4))[1] in connection with the death of his girlfriend's three-year-old son. Petitioner was acquitted of the other count of the indictment charging intentional murder (P.L. § 125.25(2)).

───────────────────

[1] A defendant is guilty of violating P.L. § 125.25(4) when, "[u]nder circumstances evincing a depraved indifference to human life, . . . the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than eleven years old and thereby causes the death of such person[.]" N.Y. PENAL LAW § 125.25(4)). "Depraved indifference murder is not a lesser degree of intentional murder." People v. Suarez, 6 N.Y.3d 202, 211 (2005) (footnote omitted). Both are class A-1 felonies. See N.Y. PENAL LAW § 125.25.

## II.       Factual Background

In February 2004, Melissa Kernan ("Kernan") and her three-year-old son, Corbin Strassner ("Corbin"), lived with Petitioner at 2013 Michigan Street in Wayland, New York. T.149, 153.[2] At first, Corbin enjoyed spending time with Petitioner. However, after living together for approximately one month, Corbin would start to cry when he was around Petitioner. T.158-67. Kernan worked nights, and at those times, Corbin would either spend the night with Petitioner or with his biological father, James Strassner ("Strassner"). T.168. After spending time at Strassner's house, Corbin would cry and would not want to go home with Petitioner. T.565-67.

At approximately 10:00 p.m. on February 8, 2004, Kernan left for her job in Rochester, leaving Corbin in Petitioner's care. Earlier that day, Kernan had helped her son get dressed and noticed a small, older bruise on his back and "a couple small bruises on his shins", but no other marks. T.189-90.

At approximately 2:00 a.m. on February 9, 2004, Petitioner knocked on the door of the trailer across the street, where Kimberly Fronk lived. Petitioner asked her to call an ambulance because his child had fallen. T.32. When the ambulance arrived about 10 minutes later, Corbin was unresponsive and "there was a large swelling on the left side of his head." T.48. On the way to

---

[2]
     Citations to "T." refer to pages from the transcript of Petitioner's trial, submitted by Respondent in connection with his answer (Dkt #14) to the petition.

Noyes Memorial Hospital in Dansville, Petitioner told the emergency medical technician that he was in bed when he heard a crash, and also stated that Corbin had been standing on the kitchen counter reaching for a gun cleaning kit, and had fallen off the counter. T.50.

Dansville Police Department Officer Chad VanAuken ("VanAuken") was called to the hospital by a hospital staff member, and he observed Corbin and Petitioner arrive. In response to VanAuken's question about what happened to Corbin, Petitioner stated that he was asleep when he heard a loud crash; he went into the kitchen and found Corbin on the floor. T.67. Petitioner appeared emotional and was crying. T.68-69. Petitioner then spoke with Police Deputy Michael Williams, and told him that he and Corbin were asleep together on the living room floor and that Petitioner was awoken by a loud crash. When he woke up, he saw Corbin lying on the floor with an overturned chair next to him. T.83-85. Sergeant Michael Smith ("Sgt. Smith") of the Steuben County Sheriff's Department also questioned Petitioner. Petitioner again stated that he and Corbin were sleeping on the living room floor. He added that Corbin woke up and went into the kitchen to get a gun cleaning kit out of the top cupboard. T.116. Petitioner was woken by a "giant crash," and found Corbin lying on the floor. T.116. Sgt. Smith asked one of the doctors treating Corbin if the child's injuries were consistent with a fall, and the doctor said, "possibly," but that they would

know more when Corbin was airlifted to Rochester. T.117. Sgt. Smith then read Petitioner his <u>Miranda</u> rights, which Petitioner waived. After giving a written statement, Petitioner was driven to a friend's house.

Meanwhile, Corbin had been transferred by helicopter to Strong Memorial Hospital in Rochester. The next morning, Petitioner, Kernan, Kernan's mother, and Strassner, and Strassner's parents were all sitting in a waiting room when a social worker questioned Petitioner about what happened to Corbin. Petitioner said Corbin fell and that petitioner found him lying on his back. Petitioner hesitated and then said that he found Corbin lying on his left side. T.198. At that point Strassner's father accused Petitioner of lying and "went after" Petitioner. Shortly thereafter, Petitioner left the hospital, because he did "not feel welcome there" and because "everybody thought he did it." T.203.

At 11:00 a.m., Kernan was permitted to see Corbin, and she noticed that he had bruises all over his body, which had not been there when she had left for work the previous night. T.194-95. At about 12:30 p.m., forensic pediatrician Dr. Ann Lenane found Corbin in unstable condition; he was on a respirator to help him breathe and was receiving medications to stabilize his blood pressure. He also was showing signs of brain swelling. T.338-40. According to Dr. Lenane, the bruises were not consistent with Corbin having fallen from the counter. T. 348, 355. Rather, his injuries were

similar to what a child who had been in a severe car accident would have sustained. Dr. Lenane believed that this was possibly the worst case of cranial injuries that she had ever seen. T.356. Dr. Lenane opined, "I think he was beaten in some way . . . . The number of bruises, location, the complexity of the fractures, severity of the head injury and severity of the eye bleeds are signs of severe multiple trauma, not like a single fall." T.357.

At around 1:00 p.m., Kernan called Petitioner to inform him that Child Protective Services and the police wanted to talk to him and to view the trailer, and that he needed to let them in. Petitioner responded that he was going to his father's house and that she should come let them in herself. T.205. When Kernan called Petitioner later that day, Petitioner said he had wanted to commit suicide, but his father and brother talked him out of it. T.207. Kernan informed him that the doctors believed that Corbin would not survive. Petitioner responded that he would be hiding out in the barn. T.210-11.[3]

Meanwhile, Investigator Eric Tyner ("Inv. Tyner") of the Steuben County Sheriff's Department searched the trailer Petitioner shared with Kernan and found a metal pipe wrapped in electrical tape underneath a pile of clothes in the bedroom. T.545-46. The pipe was clean and there were no bodily fluids on it. Inv. Tyner

---

[3]

Sarah Connor, the wife of one of Petitioner's friends, testified that when she inquired about Corbin, Petitioner replied that his girlfriend was "pissed". T.518. Petitioner also commented, "'I'm fucked.'" Id.

measured the height of the kitchen counter from which Corbin allegedly fell to be 3 feet. T.547. Petitioner was arrested the following day, on February 10, 2004.

After Corbin's death, Monroe County Deputy Medical Examiner Caroline Dignan, M.D., performed an autopsy on the boy's body. In her opinion, Corbin's death was a homicide and occurred as the result of "blunt head trauma". T.256, 298. Corbin had sustained several contusions on the right side of his forehead measuring up to 1-inch in size, a very large contusion on the left side of his head near his left eye, and an abrasion near his right eye and nose. T.258. Additional abrasions covered Corbin's entire body-the back of his head, both the right and left shoulders, his whole back, below his right nipple, the left side of his chest, his right elbow and forearm, his left hip, his right and left thighs, and his left shin and right ankle. One bruise on his lower back measured 2-1/4 inches. T.259-60. Dr. Dignan observed was a large complex skull fracture and a "hemorrhage over the entire brain." T.273. There were also hemorrhages to his eye, and his retina was "torn away from its normal attachment." T.278. Dr. Dignan opined that Corbin's injuries were not consistent with Petitioner's story that the child fell off of a 3-foot-high kitchen counter, based on the extent of the injuries and the degree of force that was necessary to inflict them; she opined that it would take more than a fall from the counter to produce such injuries. T.286-87. Dr. Dignan

further stated that the location of the bruises on Corbin's body were not consistent with his having fallen, but were much more consistent with inflicted trauma. T.287-88.

The defense called two medical experts, Dr. Shaku Teas and Dr. Robert Greendyke, each of whom testified that the injuries sustained by Corbin could have been caused by a fall from a kitchen counter, as hypothesized by Petitioner. T.406-08, 438-41, T.615-16. Dr. Teas testified about studies indicating that, in certain cases, an infant can sustain a skull fracture from a fall of about 3 feet. T.396-99.[4] Dr. Teas opined that some bruising may have been the result of the tubing and instruments used by hospital staff to treat Corbin.

Dr. Greendyke testified that Disseminated Intravascular Coagulation ("DIC"), a condition that affects the blood's clotting ability, can be caused by trauma and can result in bruising or hemorrhages. T.600, 605.[5] Dr. Greendyke opined that some of the bruising was a result of ecchymosis (an area of bleeding into the skin) which was "greatly exaggerated" by the DIC. T.604, 609. According to Dr. Greendyke, the bruising on Corbin's extremities

---

[4]

During her rebuttal testimony, Dr. Lenane testified that the studies relied on by Dr. Teas involved different circumstances from Corbin's case and therefore were not comparable. T.492-94.

[5]

Dr. Lenane testified in rebuttal that Corbin had several bruises that were not likely to have been caused by his treatment at the hospital. T.496. She also testified that DIC takes hours to occur; a photograph taken of Corbin at 3:35 a.m., at the hospital in Dansville, showed that he had already had bruises present in multiple areas. T.497.

was evidence of internal bleeding, not forcefully inflicted trauma. T.616. Dr. Greendyke opined that the evidence permitted no means of determining whether death was accidental or due to intentionally inflicted trauma. T.617.

Prior to rendering his verdict on March 17, 2005, Judge Bradstreet commented, "I'll just note that I did not ascribe a great deal of weight to the testimony of Dr. Greendyke and Dr. Teas." T.686. Judge Bradstreet then found Petitioner not guilty of intentional murder (P.L. § 125.25(1)) as charged in the first count of the indictment, but guilty of depraved indifference murder of a person less than 11-years-old (P.L. § 125.25(4)) as charged in the second count. T.686-87.

On June 13, 2005, Petitioner appeared before Judge Bradstreet, who sentenced him to an indeterminate term of 24 years to life in prison, which was less than the maximum sentence possible of 25 years to life. The judgment of conviction was unanimously affirmed on direct appeal by the Appellate Division, Fourth Department, of New York State Supreme Court. People v. Nickels, 37 A.D.3d 1110 (4th Dep't), lv. denied, 8 N.Y.3d 988 (2007).

## III. The Federal Habeas Proceeding

The Court assumes the parties' familiarity with the procedural history of this matter, which is set forth in more detail this Court's Decision and Order granting Petitioner a stay and abeyance

in order to pursue an application for a writ of error coram nobis. Following completion of the coram nobis proceeding, Petitioner returned to this Court and filed a motion to lift the stay (Dkt #35), and the case has been restored to the Court's active docket.

The Amended Petition ("AP") (Dkt #27), is the operative pleading in this matter. In it, Petitioner asserts three main grounds for relief, with multiple subgrounds. As his First Ground for Relief (AP ¶¶ 90-111), Petitioner claims that he was denied a fair trial and due process of law because the prosecution offered insufficient evidence to prove depraved indifference murder. As his Second Ground for Relief (AP ¶¶ 112-126), Petitioner asserts a violation of Brady v. Maryland, 373 U.S. 83 (1963). As his Third Ground For Relief, Petitioner asserts he was denied the effective assistance of trial, appellate, and federal habeas counsel. The first subground pertains to trial counsel's performance. See AP ¶¶ 134-140. The second subground of the Third Ground for Relief attacks appellate counsel's performance. See AP ¶ 141-145. The third subground of the Third Ground for Relief relates to Petitioner's initially retained habeas counsel, the now-defunct Pro Se Litigators, whom he asserts provided ineffective assistance by filing an untimely habeas petition.

Respondent has filed an answer and memorandum of law in opposition to the amended petition, asserting the affirmative

defenses of non-exhaustion and procedural default as to a number of Petitioner's claims. Respondent also argues that all of the claims lack merit. Petitioner has filed a reply brief.

For the reasons discussed below, the Court denies Petitioner's request for a writ of habeas corpus.

## IV. Analysis of the Amended Petition

### A.   Legal Insufficiency of the Evidence (First Ground for Relief)

Petitioner was convicted of one count of P.L. § 125.25(4), which is proven when, "[u]nder circumstances evincing a depraved indifference to human life, . . . the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than eleven years old and thereby causes the death of such person[.]" N.Y. PENAL LAW § 125.25(4). Petitioner now contends that the prosecution's evidence did not prove recklessness or depraved indifference but instead suggested that Petitioner intentionally caused Corbin's death, and asserts that the prosecution focused only an intentional-murder theory at trial. Petitioner also argues his "acts of care and concern" for Corbin precluded a finding of depraved indifference.

#### 1.   Background

At the time of his trial and conviction in 2005, the law concerning depraved indifference murder was stated in People v. Register, 60 N.Y.2d 270, 276 (1983). Recklessness was the mens rea, and the defendant's depravity and indifference were assessed

objectively based on a review of the circumstances of the crime. See, e.g., People v. Sanchez, 98 N.Y.2d 373, 379-80 (2002) (affirming that "the requirement of circumstances evincing a depraved indifference to human life . . . focuses not on the subjective intent of the defendant, 'but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct'") (quoting Register, 60 N.Y.2d at 277). During this period, the New York Court of Appeals approved the use of twin-count indictments such as the one handed down in Petitioner's case, finding that it was not inappropriate for the fact-finder to be permitted to decide whether a defendant should be convicted of intentional or depraved indifference murder. See, e.g., Sanchez, 98 N.Y.2d at 384, 386. In 2003, the New York Court of Appeals issued People v. Hafeez, 100 N.Y.2d 253, 259 (2003), the first of its decisions representing a shift toward restricting the circumstances under which a defendant could be found guilty of depraved indifference murder. Other cases followed, further narrowing the class of fact-patterns to which depraved indifference applied. See, e.g., People v. Suarez, 6 N.Y.3d 202, 207, 212-13 (2005) (per curiam) (stating that "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances"); People v. Payne, N.Y.3d 266, 270

(2004).[6] Appellate counsel cited this trio of cases and focused on
what he characterized as the "course of conduct" element of the
offense. He argued that there was "no causal connection between the
alleged course of conduct (which purportedly caused the bruising
[on the child's body]) and the child's actual cause of death[,]"
Petitioner's Appellate Brief ("Pet'r App. Br.") at 31-32, which was
blunt force trauma to the head. Appellate counsel also argued that
Petitioner's actions "upon discovering Corbin was injured" evinced
care and concern for the child's well-being, precluding a finding
that Petitioner's actions were "so wanton, so deficient in a moral
sense of concern, so devoid of regard of the life or lives of
others, and so blameworthy as to warrant the same criminal
liability as that which the law imposes upon a person who
intentionally causes the death of another." Id. (quotation
omitted).[7]

---

[6]     All of these cases involved convictions under P.L. § 125.25(2), depraved
indifference murder of a person older than 11 years; as noted above, Petitioner
was convicted under P.L. § 125.25(4), which is restricted to murders where the
victim is less than 11 years-old. The New York Court of Appeals has recognized
a "species of depraved indifference murder in which the acts of the defendant are
directed against a particular victim but are marked by uncommon brutality-coupled
not with an intent to kill . . . but with depraved indifference to the victim's
plight." Payne, 3 N.Y.3d at 271-72. Cases falling within this "species"
frequently involve fatal child abuse, a crime typically committed while a
caretaker is alone with the victim. See Payne, 3 N.Y.3d at 271-72 ("Instances
include where, without the intent to kill, the defendant inflicted continuous
beating on a three-year-old child (see People v. Poplis, 30 NY2d 85 [1972],
fractured the skull of seven-week-old baby (see People v. Bryce, 88 NY2d 124
[1996], repeatedly beat a nine year old (see People v. Best, 85 NY2d 826
[1995]")).

[7]     Prior to the Appellate Division decision in Petitioner's appeal on
February 2, 2007, the New York Court of Appeals issued People v. Feingold, 7
N.Y.3d 288 (2006). Feingold formally overruled Register by holding that "depraved
indifference to human life is a culpable mental state." Id. at 294.

The Appellate Division held that Petitioner "failed to preserve for [its] review his contention that the evidence is legally insufficient to support the conviction[.]" <u>Nickels</u>, 37 A.D.3d at 1111 (citing <u>People v. Gray</u>, 86 N.Y.2d 10, 19 (1995)). Respondent argues that the Appellate Division's reliance on a state procedural rule requiring preservation by a timely and specific objection is an adequate and independent ground foreclosing habeas review. As discussed below, the Court agrees.

### 2. The claim is procedurally barred by an adequate and independent state ground.

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989) (citations and internal quotations omitted).

"In New York, an objection to the legal sufficiency of the evidence takes the form of a motion to dismiss[,]" <u>Baker v. Kirkpatrick</u>, 768 F. Supp.2d 493, 499 (W.D.N.Y. 2011) (citation omitted), which must be made in order for an insufficient evidence claim to be preserved for appellate review. <u>Id.</u> (citation omitted). "New York courts have consistently held that a general motion to

dismiss is not sufficient to preserve the contention that the evidence at trial was insufficient to establish a specific element of the crime charged." Id. (citing Gray, 86 N.Y.2d at 20-22) (holding that where a defendant argues that evidence to support his conviction was legally insufficient, preservation of that contention is required by appropriate objection) (citing N.Y. CRIM. PROC. LAW § 470.05(2)). Here, as noted above, the Appellate Division cited Gray, 86 N.Y.2d at 19, supra, as the basis for finding Petitioner's claim unpreserved.

Petitioner does not dispute the adequacy or the independence of the procedural ground relied on by the Appellate Division. Indeed, the Second Circuit has repeatedly held that New York's contemporaneous objection rule is firmly established and regularly followed by the state courts in the context of legal insufficiency claims. See, e.g., Garvey v. Duncan, 485 F.3d 709, 718 (2d Cir. 2007). Moreover, the Appellate Division's application of the rule in this case was not exorbitant, especially since trial counsel made no motion for a trial order of dismissal at the close of the proofs and thus did not comply at all with the contemporaneous objection rule. See id. at 719-20.

### 3.  Petitioner cannot show cause and prejudice.

"As a general rule, claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." House v. Bell, 547 U.S. 518, 536 (2006) (citations omitted). A petitioner

may demonstrate cause by "showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . [or that] 'some interference by state officials' made compliance impracticable . . . [or that] the procedural default is the result of ineffective assistance of counsel[.]" Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal citation and quotation omitted).

Petitioner argues that his trial counsel's ineffectiveness in failing to preserve his legal insufficiency claim by making a timely and specific objection demonstrates "cause" to excuse the default. In order for attorney error to constitute "cause" excusing a procedural default, "[n]ot just any deficiency in counsel's performance will do . . . .[T]he assistance must have been so ineffective as to violate the Federal Constitution." Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Murray, 477 U.S. at 488-89). In addition, the exhaustion doctrine "requires that a claim of ineffective assistance be presented to state courts as an independent claim before it may be used to establish cause for a procedural default. . . ." Edwards, 529 U.S. at 451 (citing Murray, 477 U.S. at 489). Thus, to use attorney ineffectiveness to excuse a procedural default, a petitioner must either have properly exhausted an ineffective assistance of counsel claim in the state courts or, if the ineffective assistance of counsel claim is itself procedurally barred, separately show that there is "cause" excusing the procedural default as well as prejudice resulting from the error. Id. at 453. As discussed more fully below, Petitioner's

claim of ineffective assistance of trial counsel is itself procedurally defaulted, and Petitioner cannot overcome the default. Accordingly, Petitioner cannot use trial counsel's ineffectiveness as "cause" to excuse the procedural default of his legal insufficiency claim. See Edwards, 529 U.S. at 453.

Petitioner alternatively argues that he can establish cause based on "the post-trial change in New York's depraved-indifference jurisprudence." See Petitioner's Supplemental Memorandum of Law at 13. It is true that a petitioner may establish "cause" for a procedural default where an argument was so novel at the time of his trial and conviction that its legal basis was not reasonably available to counsel. Reed v. Ross, 468 U.S. 1, 16 (1984). Where, however, "the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default." Engle v. Isaac, 456 U.S. 107, 134 (1982) (footnote omitted). Petitioner's trial occurred in March 2005, and he was sentenced on June 13, 2005. By that time, the New York Court of Appeals had already decided a number of cases (e.g., Hafeez, 100 N.Y.2d 253, supra; Payne, 3 N.Y.3d 266, supra) marking "a perceptible, evolving departure from the underpinnings of depraved indifference murder as expressed in Register[.]" Policano v. Herbert, 7 N.Y.3d 588, 602-03 (2006). In addition, prior to Petitioner's conviction, some prisoners were challenging, on direct appeal and federal habeas

-16-

review, the sufficiency of the evidence supporting depraved indifference murder convictions in the context of one-on-one killings. See Sanchez v. Lee, No. 10-CV-7719, 2011 WL 924859, at *27 (S.D.N.Y. Mar. 16, 2011) (discussing and collecting cases), adopted by, 2011 WL 3477314 (S.D.N.Y. Aug. 8, 2011), aff'd, 508 F. App'x 46 (2d Cir. 2013).

Notably, courts in this Circuit have found that habeas petitioners whose trials occurred well before March 2005 could not establish "cause" based on the evolving state of the law regarding New York's depraved indifference murder statute. See, e.g., Sanchez, 2011 WL 924859, at *18 n. 30 ("[A]t the time of Sanchez's trial in March 2004, the argument that depraved indifference was the proper mental state for depraved indifference murder was reasonably available to defense counsel. While this argument only may have been a dissenting viewpoint (albeit shared by three of the seven judges of the Court of Appeals), it is evident that it was an issue that was being challenged in the courts.") (citations omitted). This Court therefore finds that the attack on the sufficiency of the evidence that Petitioner believes trial counsel should have made was not so novel that its legal basis was not reasonably available to counsel at the time of trial. See, e.g., Graham v. United States, 09 Civ. 5586, 2010 WL 2730649, at *2 (E.D.N.Y. July 8, 2010) ("If the claim had been 'percolating' in other courts, then the claim was available to counsel and the 'mere fact that counsel failed to recognize the basis for the claim, or

failed to raise the claim despite recognizing it, does not constitute cause.'") (quoting <u>Murray</u>, 477 U.S. at 486).

The cause and prejudice requirement is phrased in the conjunctive. <u>See</u> <u>Murray</u>, 477 U.S. at 496 (upholding "adherence to the cause and prejudice test 'in the conjunctive'") (internal citation omitted). Thus, Petitioner's failure to show cause for not lodging a timely and specific contemporaneous objection is fatal to his ability to excuse the procedural default based on the "cause and prejudice" exception. <u>See</u>, <u>e.g.</u>, <u>Levine v. Commissioner of Corr. Servs.</u>, 44 F.3d 121, 127 (2d Cir. 1995) ("Since [the petitioner] has failed to show cause, there is no need to address the prejudice requirement.").

### 4.   **Petitioner cannot show a fundamental miscarriage of justice.**

Alternatively, a petitioner may obtain habeas review of a procedurally defaulted claim if he can establish that such review is necessary to correct "'a fundamental miscarriage of justice.'" <u>Coleman</u>, 501 U.S. at 748 (quoting <u>Engle</u>, 456 U.S. at 135; citing <u>Murray</u>, 477 U.S. at 496). "To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,'" the Supreme Court has "explicitly tied the miscarriage of justice exception to the petitioner's innocence." <u>Schlup v. Delo</u>, 513 U.S. 298, 321-22 (1995) (citing, <u>inter alia</u>, <u>Murray v. Carrier</u>, 477 U.S. at 496 (the fundamental miscarriage of justice exception requires the

petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is *actually* innocent") (emphasis supplied)). Actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." Schlup, 513 U.S. at 329 (internal citations omitted). The Supreme Court explained in Schlup that "[w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." Id. at 316.

Petitioner contends that because the prosecution failed to supply legally sufficient proof of all elements of depraved indifference murder, as reformulated by the New York Court of Appeals before his conviction became final, he is "actually innocent" of the crime of which he was convicted (depraved indifference murder of a child). As Respondent points out, Petitioner has pointed to no new evidence whatsoever to establish that he was not criminally responsible for the child's death. Indeed, he has not come forward with any evidence that the trial court, as finder-of-fact, has not heard.

Despite Schlup's requirement of "new evidence" of innocence, Petitioner contends that in light of the Supreme Court's decision in Bousley v. United States, 523 U.S. 614 (1998), "new evidence" is not required in cases where, as here, the petitioner asserts an

underlying constitutional claim of legally insufficient evidence. In <u>Bousley</u>, a Section 2255 motion to vacate a federal conviction, the petitioner pled guilty to "'using'" a firearm "'during and in relation to a drug trafficking crime'" in violation of 18 U.S.C. § 924(c). <u>See</u> 523 U.S. at 616. Five years later, the Supreme Court ruled that the term "use" requires "'active employment of the firearm,'" and therefore "'a defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds,' or for 'placement of a firearm to provide a sense of security or to embolden.'" <u>Bousley</u>, 523 U.S. at 617. Petitioner argued that the Supreme Court's new precedent called into question whether he had actually "used" a firearm within the meaning of the statute and claimed his plea lacked a factual basis. The Supreme Court remanded the case to the district court to permit the petitioner to attempt to make a showing of actual innocence by "demonstrat[ing] that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." <u>Id.</u> at 623 (quotation omitted).

The <u>Bousley</u> court's omission of the "new evidence" language from the <u>Schlup</u> test is most reasonably explained by the fact that <u>Bousley</u> dealt with a guilty plea rather than a finding of guilt by a jury: "Because the petitioner in <u>Bousley</u> pled guilty, all evidence of innocence was 'new' evidence—there was no initial trial at which 'old' evidence was presented." <u>Jacobson v. Douma</u>, No. 14-cv-0296, 2015 WL 403879, at *2 (E.D. Wis. Jan. 29, 2015) (citing

_House_, 547 U.S. at 538 (noting that "a _Schlup_ claim involves evidence the trial jury did not have before it"); _Bousley_, 523 U.S. at 630 (Scalia, J., dissenting) (noting the problems with applying the "new evidence" requirement of the actual-innocence exception to cases involving pleas)); _see also_, _e.g._, _Harris v. Virga_, No. 2:12-cv-02846-LKK-AC, 2014 WL 51135, at *5 (E.D. Cal. Jan. 6, 2014) ("Nothing in _Bousley_ purported to alter the requirements of _Schlup_. . . . _Bousley_ expressly quoted _Schlup_'s actual innocence standard.") (citing _Bousley_, 523 U.S. at 623 (quoting _Schlup_, 513 U.S. at 327-28)). While the term "new evidence" did not make sense in the context of Bousley's guilty plea, it does make sense when one is considering a case where the petitioner has been tried by a jury (or a judge).

The Supreme Court's subsequent decisions in the Section 2254 arena support this reading of _Bousley_, as well as the conclusion that _Bousley_'s omission of "new" did not abrogate the standard articulated in _Schlup_. See, _e.g._, _House v. Bell_, 547 U.S. at 536-37 ("[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of _new evidence_, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'")(quoting _Schlup_, 513 U.S. at 327; emphasis supplied). Recently, the Supreme Court "underscore[d]" that the "miscarriage of justice exception . . . applies to a severely confined category: cases in which _new evidence_ shows 'it is more likely than not that no reasonable juror

would have convicted [the petitioner].'" McQuiggin v. Perkins, 133 S. Ct. 1924, 1933 (2013) (quoting Schlup, 513 U.S. at 329 (brackets in original; emphasis supplied)).

The Court respectfully declines to adopt the reasoning of the district court decisions holding that a petitioner may show actual innocence sufficient to excuse a procedural default in state court by identifying a change in the law that occurred post-conviction but before the conviction became final. See Fernandez v. Smith, 558 F. Supp. 2d 480, 494 (S.D.N.Y. 2008); Petronio v. Walsh, 736 F. Supp. 2d 640, 658 (E.D.N.Y. 2010). The Court instead finds persuasive the district court decisions finding the fundamental miscarriage of justice exception to be unavailable to Section 2254 petitioners whose actual innocence argument rests on an application of new law to the same facts adduced at the petitioner's trial. See Sanchez v. Lee, 2011 WL 3477314, at *5-6; Lampon v. Lavalley, No. 10-2591, 2011 WL 684623, at *10-11 (E.D.N.Y. Feb. 16, 2011), aff'd, 504 F. App'x 1 (2d Cir. 2012); Gutierrez v. Smith, No. 06-cv-4939, 2010 WL 3855225, at *9-10 (E.D.N.Y. Sept. 27, 2010), rev'd in part on other grounds, 702 F.2d 103 (2d Cir. 2012). As the district court explained in Sanchez, Bousley is distinguishable because "no principles or comity and federalism that serve as the foundation for a federal court affording deference to a state appellate court decision premised on independent and adequate procedural grounds [we]re at play" in that case. Sanchez v. Lee, 2011 WL 3477314, at *5; see also, e.g., Sweet v. Bennett, 353 F.3d 135, 140 (2d Cir.

2003) (finding that a Supreme Court's decision in a § 2255 case was "not a constitutional decision"; refusing to apply it to a § 2254 petition because the case did "not address the concerns of comity and federalism, essential to § 2254 and the independent and adequate state ground doctrine") (citing Coleman, 501 U.S. at 730-31). Petitioner argues that such concerns of comity and federalism are immaterial because they were not mentioned in Bousley; however, there was no need for them to have been mentioned in that Section 2255 proceeding.

Significantly, although Petitioner relies heavily on Bousley for his "intervening change in the law" theory of the fundamental miscarriage of justice exception, he neglects to mention this oft-quoted statement from Bousley: "'[A]ctual innocence' means factual innocence, *not mere legal insufficiency*." Bousley, 523 U.S. at 623-24 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992); emphasis supplied). At bottom, Petitioner's actual innocence claim is nothing more than a restatement of his claim that, based on the sea-change in New York's depraved indifference jurisprudence that culminated in Feingold's overruling of Register, his conviction was not supported by legally sufficient evidence. See, e.g., Pet'r Supp. Mem. at 10-35. This claim is fundamentally no different than the raft of legal insufficiency claims that flooded the state appellate courts and federal habeas courts in Feingold's wake. The Supreme Court, however, has repeatedly emphasized that circumstances meriting the consideration of procedurally defaulted

constitutional claims are "extremely rare" and occur only in the "'extraordinary case.'" Schlup, 513 U.S. at 321, 322 (quotation omitted). Moreover, the lower courts have been strongly cautioned to exercise "restraint" in expanding exceptions to the adequate and independent state ground doctrine, see Dretke v. Haley, 541 U.S. 386, 395 (2004), for without it, a federal district court would be able to offer state prisoners "whose custody was supported by independent and adequate state grounds an end run around the limits of [the Supreme] Court's jurisdiction and a means to undermine the State's interest in enforcing its laws." Coleman, 501 U.S. at 730-31; accord Sweet, 353 F.3d at 140-41. Petitioner's actual innocence argument cannot be squared with the Supreme Court's admonishment concerning the extreme rarity of such claims and its reluctance to expand exceptions to the procedural default rule. Therefore, the Court rejects it.

   B.   **Brady Claim (Second Ground for Relief)**

      1.   **Background**

      As he did on direct appeal, Petitioner claims that he is entitled to habeas relief because the prosecution failed to turn over an unredacted copy of a police report that detailed actions taken by a sheriff's department deputy during the preliminary stages of the investigation. Petitioner complains that he should have been provided with the portion of the report in which the officer asked an emergency room doctor whether the injuries Corbin could have resulted from a fall, and the doctor responded,

"possibly," but could not say for sure. This portion of the report was redacted from the copy provided to Petitioner with the prosecution's New York Criminal Procedure Law ("C.P.L.") § 710.30 notice. However, defense counsel received an unredacted copy of the report prior to the presentation of the proof. At that time, trial counsel did not ask for an adjournment to locate the emergency room doctor, but simply requested dismissal of the indictment as a sanction for the alleged Brady violation. The trial judge stated, "I can't see that there is much significance to the hearsay statement about obviously equivocal opinions by someone who is emergency room situation and so I don't find that there is a Brady violation here[.]" T.112.

The Fourth Department held, inter alia, that even assuming the report's redacted portion was Brady material, its belated disclosure did not require reversal, "particularly in view of the equivocal nature of the doctor's statement." Nickels, 37 A.D.3d at 1111. Thus, Petitioner failed to establish that there was "a 'reasonable possibility' that the failure to disclose the . . . report [in a timely manner] contributed to the verdict." Id. (quotation and citation omitted; alteration and ellipsis in original). Petitioner's appellate counsel did not include the Brady claim in his letter seeking leave to appeal to the New York Court of Appeals.

> ### 2. The <u>Brady</u> claim is unexhausted, but must be deemed exhausted and procedurally defaulted.

Respondent argues that by not including the <u>Brady</u> claim in his leave application, Petitioner did not fairly present the claim to the New York Court of Appeals, and therefore it is unexhausted.[8] <u>See</u>, <u>e.g.</u>, <u>Grey v. Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991) (habeas petitioner did not present highest state court with prosecutorial misconduct and sentencing claims where he merely attached a copy of the brief submitted to intermediate appellate court to the leave application, which referred only to a different issue). For exhaustion purposes, "'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" <u>Id.</u> (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 263 n. 9 (1989)). Here, Petitioner has used the one direct appeal to which he is entitled. <u>E.g.</u>, <u>Cunningham v. Conway</u>, 717 F. Supp.2d 339, 365 (W.D.N.Y. 2010) (citing N.Y. R. Ct. § 500.20(a)(2), (d); other citations omitted). The claim would be subject to mandatory dismissal in a collateral motion to vacate the judgment, as the trial court would be required to deny it because it was raised and decided on direct appeal. <u>See</u>

---

[8] For purposes of the habeas exhaustion requirement, petitioners in New York must "invoke 'one complete round of the State's established appellate review process,'" which means that "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." <u>Galdamez v. Keane</u>, 394 F.3d 68, 74 (2d Cir.) (quotation omitted; citing N.Y. Crim. Proc. Law § 460.20; other citation omitted)), <u>cert.</u> <u>denied</u>, 544 U.S. 1025 (2005). Leave applicants must "indicate [in the leave letter] . . . the grounds on which leave to appeal is sought[.]" N.Y. Ct. R. § 500.20(a)(4).

N.Y. CRIM. PROC. LAW § 440.10(2)(a). Accordingly, the Brady claim must be deemed exhausted but procedurally defaulted.

Turning to the issue of whether Petitioner can show cause and prejudice for the default of the Brady claim, Petitioner asserts that his appellate counsel's ineffectiveness in failing to include the Brady claim in the leave application constitutes "cause" for the default. However, in order to serve as "cause", a claim of attorney ineffectiveness first must be exhausted. See Edwards, 529 U.S. at 451-52. Petitioner did not assert in his coram nobis motion that appellate counsel was ineffective in failing to include the Brady claim in the leave application. Therefore, this ineffective appellate counsel claim is unexhausted and cannot be used to excuse the procedural default of the Brady claim. See Larocco v. Senkowski, 65 F. App'x 740, 743 (2d Cir. 2003) (summary order) ("Petitioner may not rely on an unexhausted claim of ineffective assistance of appellate counsel to establish cause for the procedural default of his voluntariness claim.").

Petitioner's inability to demonstrate cause obviates the Court's need to consider whether prejudice exists. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not Stepney showed prejudice."). In any event, Petitioner cannot show prejudice because the claim is

plainly without merit. All _Brady_ requires is disclosure "in time for [the material's] effective use" by the defendant. _United States v. Coppa_, 267 F.3d 132, 144 (2d Cir. 2001). _See also United States ex rel. Lucas v. Regan_, 503 F.2d 1, 3 n. 1 (2d Cir. 1974) ("Neither _Brady_ nor any other case requires that disclosures under _Brady_ must be made before trial."). As the Fourth Department determined, the substance of the redacted statement was made known to Petitioner nearly six months prior to the trial, during the officer's testimony at the suppression hearing, and Petitioner did not seek a continuance to obtain the doctor's testimony. _Nickels_, 37 A.D.3d at 1111.

Finally, as discussed _supra_ in Section IV.A.4, Petitioner cannot demonstrate entitlement to the fundamental miscarriage exception. Therefore, Petitioner's _Brady_ claim is subject to an unexcused procedural default, and it is dismissed on this basis.

## C. Ineffective Assistance of Trial Counsel ("IATC") Claims (First Subground of Third Ground for Relief)

Petitioner assigns a number of errors to his trial attorney: (1) failing to move for a trial order of dismissal ("IATC Claim 1"); (2) failing to object to the prosecution's elicitation and admission of improper hearsay ("IATC Claim 2"), and (3) failing to object to the "repeated, extensive, and improper narrative testimony" by prosecution witnesses ("IATC Claim 3"). The Court considers the exhaustion status of each claim in turn.

**1.    IATC Claim 1 is Unexhausted.**

Respondent argues that this claim is unexhausted because a coram nobis motion is the incorrect procedural vehicle for exhausting a claim of trial counsel's ineffectiveness and, in any event, Petitioner did not raise a stand-alone claim of ineffective assistance of trial counsel in his coram nobis motion. See Turner v. Artuz, 262 F.3d 118, 121 (2d Cir. 2001) ("[A] petitioner cannot show exhaustion unless he has 'fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts[,]'" but "[t]he only constitutional claim Turner was permitted to raise in seeking a writ of error coram nobis was ineffective assistance of appellate counsel, a claim that is distinct from [the prosecutorial misconduct] claims . . . in procedural terms under state law and in their federal constitutional sources.") (quotation omitted; emphasis in original); accord, e.g., Rush v. Lempke, 500 F. App'x 12, 15 (2d Cir. 2012) (summary order); Jones v. Senkowski, 42 F. App'x 485, 486-87 (2d Cir. 2002) (summary order) (relying on Turner to reject petitioner's argument that a claim of ineffective assistance of appellate counsel "may still serve as a vehicle for consideration of the merits of his suggestive identification claim in state court, where the claim of ineffectiveness is premised on appellate counsel's *omission* of the suggestive identification claim" for "a claim of ineffective assistance of appellate counsel

-29-

is 'distinct' from the claim whose omission indicates such ineffectiveness") (emphasis in original).

Petitioner disagrees, urging reliance on a case decided several months after Turner, Aparicio v. Artuz, 269 F.3d 78 (2d Cir. 2001).[9] Although Petitioner contends that Turner is an "outlier", the vast majority of district courts in this Circuit have elected to follow Turner on this issue. See, e.g., Tineo v. Heath, No. CV-09-3357(SJF), 2012 WL 4328361, at *6 (E.D.N.Y. Sept. 19, 2012) (collecting cases); Gilliam v. Artus, 653 F. Supp.2d 315, 326-27 (W.D.N.Y. 2009); Ehinger v. Miller, 928 F. Supp. 291, 294 (S.D.N.Y. 1996). In addition, two subsequent panels of the Second Circuit (albeit in summary orders) have chosen to follow Turner's analysis on this issue. See Rush, 500 F. App'x at 15; Jones, 42 F. App'x at 487.

However, the Court need not address the apparent tension between Turner and Aparicio. Under the particular circumstances here, IATC Claim 1 is procedurally defaulted regardless of which approach the Court follows, as discussed further below.

---

[9]   In Aparicio, the petitioner brought a coram nobis motion raising a claim that *trial* counsel was ineffective for failing to request an eyewitness identification instruction. The state appellate court did not explicitly address this claim, stating only that the petitioner had "failed to establish that he was denied effective assistance of *appellate* counsel." Id. at 92 (quotation omitted; emphasis supplied). The Second Circuit stated that although the ineffective assistance of trial counsel claim "was not explicitly addressed, it was, as a technical matter, adjudicated; the Appellate Division denied [the petitioner]'s coram nobis application." Id. (citation omitted).

## 2.    IATC Claim 1 is procedurally defaulted.

If the Court follows <u>Aparcio</u>, then IATC Claim 1 is procedurally defaulted, and Petitioner concedes this. <u>See</u> <u>Aparicio</u>, 269 F.3d at 93 ("The Appellate Division's conclusion on <u>coram</u> <u>nobis</u> that Aparicio was not denied effective assistance of appellate counsel disposed of Aparicio's only proffered cause for the failure to raise the trial counsel claim on direct appeal. The Appellate Division's decision concerning Aparicio's trial counsel claim thus had to rest on a state procedural bar; under New York law, the decision could not possibly rest on any other ground.").

If the Court relies on <u>Turner</u>, IATC Claim 1 is unexhausted but also must be deemed exhausted and procedurally defaulted because Petitioner has no remedies available in state court. As discussed above, he cannot institute a second direct appeal. The Court also finds that even though Petitioner submitted, in support of his <u>coram</u> <u>nobis</u> motion, a conclusory affidavit from his trial counsel gratuitously asserting that he was ineffective,[10] IATC Claim 1 is not a claim that relies on matters <u>dehors</u> the record. To the contrary, trial counsel's alleged error—failing to move for a trial order of dismissal—is "particularly well-established in the trial record," <u>Sweet</u>, 353 F.3d at 139. In such cases, federal courts in New York have held that a state court's reliance on C.P.L.

_____

[10]    <u>See</u> Affidavit of Michael Diprima, Esq. (Dkt #47-18) ¶¶ 7-8 (stating that the failure to move for a trial order of dismissal of the depraved indifference count "was not part of any trial strategy" but "was a failure on [his] part to effectively represent [Petitioner]").

§ 440.10(2)(c)[11] operates as a procedural bar to a subsequent collateral attack by means of federal habeas. See, e.g., Sweet, 353 F.3d at 139 (finding that C.P.L. § 440.10(2)(c) was an adequate and independent state ground barring habeas review of ineffective assistance of trial counsel claim where trial counsel "plainly failed to object on inconsistency grounds to charging the counts in the conjunctive").

Turning to the issue of cause and prejudice, Petitioner asserts that appellate counsel's ineffectiveness in failing to raise IATC Claim 1 on direct appeal constitutes "cause" to excuse the procedural default. As discussed infra in Section IV.D, the Court finds that this claim of appellate counsel's ineffectiveness is without merit whether reviewed de novo or under the deferential standard required by 28 U.S.C. § 2254(d)(1). Because appellate counsel's ineffectiveness is not a meritorious constitutional claim, it cannot serve as "cause" for the default. See Edwards, supra.

Since Petitioner cannot show "cause", the Court need not proceed further. However, the Court notes that Petitioner cannot show "prejudice" because the Fourth Department considered the merits of his claim that the verdict was against the weight of the

---

[11]     A trial court "must" deny a motion to vacate when, "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue . . . , no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him[.]" N.Y. CRIM. PROC. LAW § 440.10(2)(c).

evidence. See Nickels, 37 A.D.3d 1110-11 ("[W]e cannot agree with defendant that the verdict rejecting his theory with respect to the cause of the victim's fatal injuries is against the weight of the evidence[.]") (citing People v. Bleakley, 69 N.Y.2d 490, 495 (1987)). As a matter of New York state law, in order to decide whether the verdict was against the weight of the evidence, the Fourth Department was required to determine if "all the elements and necessary findings [we]re supported by some credible evidence[,]" i.e., whether the evidence "satisf[ied] the proof and burden requirements for every element of the crime charged." Bleakley, 69 N.Y.2d at 495; see also People v. Danielson, 9 N.Y.3d 342, 349 (2007) ("Necessarily, in conducting its weight of the evidence review, a court must consider the elements of the crime, for . . . the prosecution's witnesses . . . must prove the elements of the crime beyond a reasonable doubt."); accord, e.g., Parker v. Ercole, 666 F.3d 830, 834-35 (2d Cir. 2012) (per curiam) ("[T]he Appellate Division addressed on the merits Parker's claim that his conviction was against the weight of the evidence, and this review necessarily subsumed review of his sufficiency claim."). Therefore, Petitioner cannot demonstrate "prejudice" to excuse the procedurally defaulted claim of ineffective assistance of trial counsel (IATC Claim 1).

Petitioner urges that the Court cannot find the absence of prejudice on this basis, because the Fourth Department did not follow the correct procedure for conducting a weight-of-the-

evidence review, that is, the Fourth Department did not first consider the elements of the crime and whether some credible evidence supported each element. Although, as Petitioner points out, the Fourth Department's decision did not explicitly discuss the recent changes in the law regarding the necessary mens rea for depraved indifference murder, the Court declines to find that the Fourth Department failed to follow state law in conducting its weight-of-the-evidence review. Such a result would be anomalous in light of the Supreme Court's refusal to "impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim-every state appeal, every denial of state collateral review-in order that federal courts might not be bothered with reviewing state law and the record in the case." Coleman, 501 U.S. at 739.

Finally, for the reasons discussed above in Section IV.A.4, Petitioner cannot show entitlement to the fundamental miscarriage of justice exception. Accordingly, IATC Claim 1 is dismissed as subject to an unexcused procedural default.

### 3.   IATC Claims 2 and 3 are too vague and conclusory to state a claim for habeas relief.

Petitioner also faults trial counsel for failing to object to the prosecution's "elicitation and admission of improper hearsay" and failing to object to the "repeated, extensive, and improper narrative testimony" by prosecution witnesses. These allegations were not raised on direct appeal or in Petitioner's coram nobis application. IATC Claims 2 and 3 appear to be claims that should be

deemed exhausted but procedurally defaulted, as they refer to errors that would have been apparent on the trial record. See Sweet, 353 F.3d at 139.

Petitioner has not provided any citations to the record where these alleged instances of "improper hearsay" and "narrative testimony" were allowed to be introduced into evidence without objection. Because IATC Claims 2 and 3 are so vague and conclusory, their summary dismissal is warranted. See, e.g., United States v. Malcolm, 432 F.2d 809, 812 (2d Cir. 1970) (stating that a habeas claim may be denied where the supporting "allegations are insufficient in law, undisputed, immaterial, vague, conclusory, palpably false or patently frivolous"); Jones v. Hollins, 884 F. Supp. 758, 766 (W.D.N.Y.) ("[W]ithout providing specific citations to the record, . . . [the petitioner's] conclusory allegation, made without any factual or case law support, is insufficient to overcome the strong presumption of reasonable assistance [afforded to defense counsel]."), aff'd, 89 F.3d 826 (2d Cir. 1995).

### D. Ineffective Assistance of Appellate Counsel ("IAAC") Claims (Second Subground of Third Ground for Relief)

Petitioner asserts multiple grounds for finding that appellate counsel provided ineffective assistance: failing to argue that the Fourth Department should reach the legal insufficiency issue, despite trial counsel's failure to move for a trial order of dismissal, either under its interests of justice jurisdiction, or because trial counsel rendered ineffective assistance ("IAAC Claim

1"); failing to raise an argument concerning the insufficiency of the evidence presented to the grand jury ("IAAC Claim 2"); failing to file a reply brief ("IAAC Claim 3"); failing to present oral argument ("IAAC Claim 4"); and failing to raise all of the issues briefed before the Appellate Division in the leave application to the Court of Appeals ("IAAC Claim 5").

### 1.   IAAC Claim 1 is exhausted.

In his <u>coram</u> <u>nobis</u> application, Petitioner raised two "Points". As "Point I," he argued that "the depraved indifferent murder statute requires proof that the People never supplied; thus, the insufficiency issue is meritorious." Affidavit of Timothy W. Hoover in Support of Motion for a Writ of Error <u>Coram</u> <u>Nobis</u> ("<u>Coram</u> <u>Nobis</u> Aff.") (Dkt #47-11), ¶¶ 45-76 (capitals omitted).  As "Point II," he asserted that "by failing to argue that either trial counsel's ineffectiveness or the court's interest of justice jurisdiction provided an adequate basis for review of an unpreserved but dispositive issue, appellate counsel's representation was constitutionally ineffective." <u>Id.</u>  IAAC Claim 1 thus has been fully exhausted because it was fairly presented as "Point II" in Petitioner's <u>coram</u> <u>nobis</u> motion to the Fourth Department, and he subsequently requested leave to appeal to the Court of Appeals.

### 2.   IAAC Claim 1 does not warrant habeas relief.

The Appellate Division summarily rejected Petitioner's IAAC Claim 1 in a one-sentence decision. <u>See</u> <u>People v. Nickels</u>, 109

A.D.3d 1217 (4th Dep't) ("Motion for writ of error coram nobis denied."), lv. denied, 22 N.Y.3d 1042 (2013). Notwithstanding the lack of an analysis, for purposes of 28 U.S.C. § 2254(d), the claim was "adjudicated on the merits." See, e.g., Sellan v. Kuhlman, 261 F.3d 303, 314 (2d Cir. 2001) (finding claim adjudicated on merits where Appellate Division stated that ineffective assistance of appellate counsel claim was "denied"; there was "no basis for believing that the Appellate Division rejected the claim on non-substantive grounds").

Pursuant to 28 U.S.C. § 2254(d), habeas relief may not be granted "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[,]" id. § 2254(d)(1), or was based upon an unreasonable determination of the facts in light of the evidence in the state record, id. § 2254(d)(2). The relevant "clearly established Federal law" is Strickland v. Washington, 466 U.S. 668 (1984), which the Second Circuit has held applies equally in the appellate context. See, e.g., Hemstreet v. Greiner, 491 F.3d 84, 89 (2d Cir. 2007) (Strickland applies to habeas claims asserting appellate counsel's ineffectiveness). Strickland requires a petitioner to "show both that his counsel provided deficient assistance and that there was prejudice as a result." Harrington v. Richter, 562 U.S. 86, 104

(2011). "Strickland does not guarantee perfect representation[.]" Id. Rather, the crux of the inquiry is whether the "attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Id. at 105 (citing Strickland, 466 U.S. at 690).

According to Petitioner, appellate counsel deprived the Fourth Department of the opportunity to examine Petitioner's legal insufficiency claim by either failing to argue that trial counsel was ineffective in failing to preserve it, or by failing to specifically request that the Fourth Department exercise its interest-of-justice jurisdiction under C.P.L. § 470.15(6)(a). Petitioner cites, e.g., People v. Dewall, 15 A.D.3d 498, 499 (2d Dep't 2005), for the proposition that the appellate divisions in New York will not exercise their interest-of-justice jurisdiction unless appellate counsel "argues that [unpreserved claims] should be" reviewed. However, Dewall does not contain any such statement. Rather, the Second Department in that case "deem[ed] the issue sufficiently significant as to warrant review as a matter of discretion in the interest," id., despite the lack of preservation, which "the defendant concede[d]," id. Likewise, in People v. DeCapua, 37 A.D.3d 1189, 1189 (4th Dep't 2007), the Fourth Department "recognize[d]" that the issue was unpreserved but reviewed it in the interest of justice. Again, this case gives no indication that appellate counsel urged the appellate court to

-38-

exercise its interest of justice jurisdiction, or that such a request factored into the court's decision to review the unpreserved claim. In sum, the Court has found no authority for Petitioner's assertion that appellate counsel "ensure[d] that the Fourth Department would not reach the . . . unpreserved insufficiency argument" by not arguing ineffective assistance of trial counsel or specifically requesting the Fourth Department exercise its interest-of-justice jurisdiction. To the contrary, the cases Petitioner cites in support are, on the whole, inapposite and easily distinguishable, not binding precedent on this Court, or both.

As the prosecution argued in opposition to Petitioner's coram nobis motion, nothing appellate counsel did or failed to do could deprive the Fourth Department of its ability to exercise its interest-of-justice jurisdiction. See, e.g., People v. Lopez, 6 N.Y.3d 248, 255 (2006) (noting that the "Appellate Division may be divested of its unique interest-of-justice jurisdiction only by constitutional amendment") (citing People v. Pollenz, 67 N.Y.2d 264, 267-68 (1986)). Intermediate appellate courts in New York State "possess expansive power, given their fact-finding function as well as the ability to reach unpreserved issues pursuant to their 'interest of justice authority'. . . ." People v. Ventura,

17 N.Y.3d 675, 676 (2011).[12] In light of this, Petitioner simply has not shown that appellate counsel's alleged error "'so undermined the proper functioning of the adversarial process[,]'" Harrington, 562 U.S. at 110 (quotation omitted), that he was denied a fair appeal.

Because Petitioner cannot meet the deficient performance prong of the Strickland test, the Court need not examine whether he has shown prejudice. See Strickland, 466 U.S. at 697. In any event, the Court cannot discern prejudice because, as discussed above, the weight-of-the-evidence review necessarily included an analysis of the sufficiency of the evidence supporting the elements of the crime of conviction. See John v. New York, No. 12 Civ.1944(CM)(JCF), 2013 WL 6487384, at *18 (S.D.N.Y. Nov. 25, 2013) ("The claim that appellate counsel was ineffective for failing to argue that trial counsel was ineffective because he did not present a sufficiency argument founders because [the petitioner] cannot show [prejudice] . . . because . . . the Appellate Division necessarily considered and rejected a sufficiency challenge in rejecting the weight of the evidence claim and the Court of Appeals denied review.") (citations omitted).

---

12

Cf. Bezio v. Dorsey, 21 N.Y.3d 93, 114 (2013) (noting that "[h]ad [certain] issues been merely unpreserved, that, of course, would not have prevented the Appellate Division from reaching and deciding them in the exercise of its interests of justice power"; the problem was that the unpreserved issues were also moot and thus the Appellate Division essentially issued an advisory opinion).

### 3. IAAC Claims 2, 3, 4, and 5 are unexhausted and plainly meritless.

Petitioner did not assert in his <u>coram nobis</u> application any other bases for appellate counsel's ineffectiveness. Therefore, IAAC Claims 2, 3, 4, and 5 never have been presented in any state court forum and have not been exhausted. Because there is no time-limit on the filing of a <u>coram nobis</u> application, and no limitation on the filing of successive applications for <u>coram nobis</u> relief, Petitioner still has remedies available in state court, and these IAAC claims remain unexhausted. <u>E.g.</u>, <u>Dominique v. Artus</u>, 25 F. Supp.2d 321, 339 (E.D.N.Y. 2014) (citing 28 U.S.C. § 2254(c)). Petitioner has not asked for another stay to file a second <u>coram nobis</u> motion. Indeed, it would be an abuse of this Court's discretion to grant a stay because Petitioner cannot possibly demonstrate "good cause" for failing to exhaust these claims in his first <u>coram nobis</u> motion. <u>See</u> <u>Rhines v. Weber</u>, 544 U.S. 269, 277-78 (2005) (stays should only be granted if the petitioner can show "good cause" for failing to exhaust earlier and can also show that his unexhausted claims are not "plainly meritless").

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applicable to the instant petition, preserved the "total exhaustion requirement" articulated in <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). <u>See</u> <u>Rhines</u>, 544 U.S. at 274 (citing 28 U.S.C. § 2254(b)(1)(A)). However, AEDPA also added a new provision,

Section 2254(b)(2), which provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." The habeas statute does not articulate a standard for denying a petition pursuant to Section 2254(b)(2), and neither the Supreme Court nor the Second Circuit has established one. The rationale behind 28 U.S.C. § 2254(b)(2) has been described as "spar[ing] state courts from needlessly wasting their judicial resources on addressing meritless claims solely for the sake of exhaustion." Keating v. New York, 708 F. Supp.2d 292, 299 n. 11 (E.D.N.Y. 2010). In this Circuit, the various formulations for the proper standard to be used share "the common thread of disposing of unexhausted claims that are unquestionably meritless." Id.

IAAC Claims 2, 3, 4, and 5 are simply conclusory allegations without supporting facts. Petitioner does not explain why the evidence presented to the grand jury was legally sufficient, and, indeed there is no basis for such a conclusion, given the trial court's finding of guilt beyond a reasonable doubt on the charge of depraved indifference murder. With regard to the failure to present oral argument, it is pure speculation on Petitioner's part that this omission had any effect on the outcome of the appeal. As to the failure to file a reply brief to address the lack of preservation, this claim is disposed of by the Court's finding that appellate counsel was not ineffective in failing to specifically

request interest-of-justice review. As discussed above, the authority imbued in the Appellate Divisions to review unpreserved claims in the interests of justice is jurisdictional and can only be reduced by constitutional amendment. Finally, the failure to include all claims from the Appellate Division brief in the leave letter was not evidence of deficient performance. As discussed above, Petitioner's Brady claim is without merit. It would have been futile to assert the weight-of-the-evidence claim and the harsh-and-excessive-sentence claim because there is no reasonable probability that the Court of Appeals would have granted leave on these issues, as they involve factual determinations by the Appellate Division that are beyond the Court of Appeals' purview. E.g., Bester v. Conway, 778 F. Supp.2d 339, 351-52 (W.D.N.Y. 2011) (citations omitted).

Finally, the Court acknowledges that Petitioner submitted along with his coram nobis motion an affidavit from appellate counsel, David M. Parks, Esq. The Court finds no basis to assign even scant weight to these self-serving, post-hoc protestations of ineffectiveness, for it is clear that appellate counsel filed a well-argued, well-supported brief. See Harrington, 562 U.S. at 110 (noting that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy").

The alleged errors by appellate counsel, whether considered singly or cumulatively, do not suffice to show either the type of "deficient performance" or "prejudice" contemplated by <u>Strickland</u> under a <u>de novo</u> standard of review. Petitioner necessarily cannot fulfill AEDPA's more deferential standard. <u>See</u>, <u>e.g.</u>, <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 389 (2010) ("The state court's decision rejecting [the petitioner]'s [habeas] claim was thus correct under <u>de novo</u> review and therefore necessarily reasonable under the more deferential AEDPA standard of review[.]") (citations omitted). Accordingly, habeas relief may not issue.

### E.   Ineffective Assistance of Original Habeas Counsel (Third Subground of Third Ground for Relief)

Petitioner asserts that the habeas attorneys he originally retained, "<u>Pro Se</u> Litigators," were ineffective because they failed to timely file a federal habeas petition on his behalf. It is well-settled that a prisoner has no constitutional right to the effective assistance of counsel when he collaterally attacks his conviction. <u>See</u> <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further"); <u>accord</u> <u>McCleskey v. Zant</u>, 499 U.S. 467, 495 (1991). Morever, this Court found Petitioner entitled to equitable tolling and deemed his petition timely. There is no other "relief" that Petitioner can obtain from this Court based on original habeas counsel's error in failing to timely file his

petition. Therefore, this claim is moot. <u>See</u>, <u>e.g.</u>, <u>In re Kurtzman</u>, 194 F.3d 54, 58 (2d Cir. 1999) ("[A] case becomes moot . . . when it is 'impossible for the court to grant any effectual relief whatever to a prevailing party.'") (quotation and other citation omitted).

## V.   Conclusion

For the reasons discussed above, Tobias Nickels' request for a writ of habeas corpus is denied, and the Amended Petition (Dkt #27) is dismissed. Because the Court finds that Petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    July 22, 2015
          Rochester, New York